# UNITED STATES DISTRICT COURT
# MIDDLE DISTRICT OF FLORIDA
# TAMPA DIVISION

ADRIAN DESOTO,

      Plaintiff,

v.                                     Case No: 8:20-cv-2551-KKM-TGW

GEICO GENERAL INSURANCE
COMPANY,

      Defendant.

_____

## ORDER

    Adrian DeSoto sued his former employer Geico General Insurance Company, alleging that GEICO violated the Family Medical Leave Act (FMLA) and Florida law. GEICO moves for summary judgment on each of DeSoto's claims. Because GEICO did not deny DeSoto any FMLA benefits and he cannot rebut GEICO's neutral reasons for its adverse actions against him, GEICO is entitled to summary judgment.

## I.    BACKGROUND[1]

    GEICO operates a regional office in Lakeland, Florida, that handles its bodily injury claims for the State. (Doc. 39-7 at 4.) The office is divided into three separate levels:

---

[1] The Court recounts the undisputed facts as contained in the record. To the extent facts are disputed or capable of multiple inferences, the Court construes the record in favor of the nonmovant. *See Sconiers v. Lockhart*, 946 F.3d 1256, 1262 (11th Cir. 2020).

Telephone Claims Representative (TCR) I, which investigates coverage and liability; TCR II, which handles soft tissue injuries; and the Continuing Unit (CU), which adjusts claims with injuries, fatalities, or litigation. (*Id.*; Doc. 43 at 1–2.) Within each level, "adjusters" are grouped on teams headed by "supervisors" who report to "managers" who, in turn, are accountable to a single "director." (Doc. 39-7 at 4; Doc. 39-4 at 5.)

From 2013 to 2020, Adrian DeSoto worked at GEICO's Lakeland office. (Doc. 39-2 at 5; Doc. 39-23.) GEICO first hired DeSoto as a TCR I insurance adjuster. (Doc. 39-2 at 5.) DeSoto received three promotions—TCR II adjuster, CU adjuster, TCR I supervisor—before receiving his fourth and final promotion to "TCR II Supervisor" in May 2019. (*Id.* at 5–6.) His responsibilities as a TCR II Supervisor included overseeing a team of TCR I adjusters and assisting them with investigating and evaluating claims. (*Id.* at 14–15.)

Desoto reported directly to four different managers during his time as a TCR II Supervisor. (*Id.* at 8–9.) Alison Johnson took the position in March 2020 and managed DeSoto through the decision to terminate him in October 2020. (*Id.*) Each of DeSoto's managers reported to Elizabeth Hedge, the office's director. (*Id.* at 8.)

### A. DeSoto's Intermittent FMLA Leave

Due to multiple personal medical issues, Desoto was approved for intermittent FMLA leave between July 2019 and October 2020. (*Id.* at 21–22.) During his intermittent-leave period, DeSoto faced three challenges at work.

First, in March 2020, DeSoto returned from a stint of FMLA leave and discovered that Barry Stemle (also a TCR II Supervisor) transferred multiple claims from DeSoto's adjusters to his own adjusters. (*Id.* at 26.) The following month, DeSoto learned that Jaime Lamar (another TCR II Supervisor) did the same thing. (*Id.* at 25–26.) To address the situation, DeSoto filed internal complaints against both Stemle and Lamar. (*Id.* at 25.) The resulting internal investigation ended favorably for DeSoto. Stemle and Lamar each received "documented conversation[s]" about their conduct, and the claims were returned to DeSoto's adjusters. (Doc. 39-6 at 3.) Neither DeSoto's pay nor his metrics were impacted in any way. (*Id.*)

Second, in May 2020, DeSoto asked Johnson (his manager) to notify him if a CU Supervisor position came open while he was once again out on FMLA leave. (Doc. 39-2 at 29–30.) She agreed to do so if she saw one. (Doc. 39-4 at 14–15.) When DeSoto returned in early July, he learned that there had been a CU Supervisor opening while he was away—but Johnson never notified him. (Doc. 39-2 at 30.) When he inquired about it, Johnson explained that she did not know about the job posting because she did not get an

email about it. (*Id.*; Doc. 39-4 at 15.) At times, the CU department would notify managers about job postings but did not email about this position. (Doc. 39-9 at 2.) And by the time DeSoto learned about the opening after returning from leave, he was unable to apply for it. (Doc. 39-2 at 30–31.) From November 2019 to August 2020, DeSoto unsuccessfully applied four separate times for the CU Supervisor position. Each time the hiring officials determined he was not the best-qualified candidate despite his managers (including Johnson) repeatedly recommending him. (Doc. 39-11; Doc. 39-12; Doc. 39-13; Doc. 39-14; Doc. 39-15.)

Third, on August 14, 2020, while DeSoto was out on FMLA leave, a claim file assigned to one of DeSoto's adjusters (who was also out on FMLA leave) was the subject of attorney-led settlement discussions. (Doc. 39-4 at 16; Doc. 39-7 at 12–13.) The file required immediate attention the day of the settlement conference. (Doc. 39-4 at 16.) Because DeSoto and his adjuster were both absent, Johnson transferred the claim file to another supervisor who worked with one of that supervisor's own adjusters to complete the necessary work and facilitate settlement of the claim. (Doc. 39-4 at 16–17.) Two weeks later, DeSoto filed an internal complaint against Johnson for transferring the claim file while he was out on FMLA leave. He claimed Johnson deviated from "standard operating procedures" when she transferred the file. (Doc. 39-2 at 32.) Johnson was not disciplined,

however, because she had discretion to transfer the file to ensure that the work was timely completed. (Doc. 39-4 at 17–18; Doc. 39-7 at 12–13.)

## B. DeSoto's Formal Warning and Termination

On July 9, 2020, Johnson was notified that an insured complained that a $10,000 payment for a claim was incorrectly attributed to her policy when she was not involved at all in the underlying accident. (Doc. 39-4 at 20; Doc. 39-7 at 11.) DeSoto mistakenly approved payment on the claim because he mixed-up two insureds with similar names. (Doc. 39-2 at 13; Doc. 39-4 at 21.) The result was $10,000 of "extracontractual exposure" for GEICO—an uncommon and serious error. (Doc. 39-4 at 19; Doc. 39-7 at 18; Doc. 39-20 at 8–9.)

On July 9, 2020, Johnson requested that DeSoto thoroughly review the claim file and provide a "claim statement" explaining why the claim was improperly handled. (Doc. 39-4 at 21–22.) The next day, DeSoto gave Johnson a brief statement. (Doc. 39-2 at 39.) Johnson determined that the statement was not detailed enough to give her a full understanding of DeSoto's version of events. (Doc. 39-4 at 22.) So, on August 20, Johnson asked DeSoto to provide a more detailed statement, which he provided. (Doc. 39-2 at 39.)

After reviewing DeSoto's revised statement, Johnson issued DeSoto a written warning on August 24 based on her assessment that his errors led to the extracontractual payment. (Doc. 39-4 at 24; Doc. 39-21.) The warning stated that DeSoto's failure to

properly investigate the claim violated GEICO's Claims Code of Conduct and advised him that further errors violating the warning could lead to his termination. (Doc. 39-21.)

GEICO's compliance team then conducted an audit into a sample of DeSoto's claims to ensure he was complying with the warning, a procedure typical in the case of extracontractual exposure. (Doc. 39-7 at 16–17.) Based on the audit results, Johnson concluded that he violated the terms of DeSoto's warning. (Doc. 39-7 at 21.) Specifically, on September 2, 2020, DeSoto reviewed a time sensitive claim file—but his review failed to address a surgery identified in the file or to provide appropriate guidance to his adjusters to handle the claim with urgency. (Doc. 39-23 at 3.) The audit concluded that these errors subjected GEICO to significant excess monetary exposure. (*Id.*) Therefore, on October 7, 2020, GEICO terminated DeSoto for violating the terms of his warning. (Doc. 39-2 at 20.)

### C. Procedural History

DeSoto brought three claims against GEICO: an FMLA interference claim; an FMLA retaliation claim; and a claim under Florida's Private Whistleblower's Act (FWA), § 448.101, Fla. Stat. (Doc. 1.) Following discovery, GEICO filed a motion for summary judgment. (Doc. 26.) When the Magistrate Judge granted additional discovery to DeSoto, the Court denied GEICO's original summary judgment motion as moot. (Doc. 35; Doc.

36.) GEICO again moves for summary judgment. (Doc. 38.) Desoto opposes the motion, (Doc. 42), and GEICO replies in support of it, (Doc. 44).

## II.   LEGAL STANDARD

Summary judgment is appropriate if no genuine dispute of material fact exists and the moving party is entitled to judgment as a matter of law. *See* FED. R. CIV. P. 56(a). A fact is material if it might affect the outcome of the suit under governing law. *See Anderson v. Liberty Lobby, In*c., 477 U.S. 242, 248 (1986).

A moving party is entitled to summary judgment when the nonmoving party "fail[s] to make a sufficient showing on an essential element of her case with respect to which she has the burden of proof." *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986). The movant always bears the initial burden of informing the district court of the basis for its motion and identifying those parts of the record that demonstrate an absence of a genuine issue of material fact. *Clark v. Coats & Clark, In*c., 929 F.2d 604, 608 (11th Cir. 1991).

When that burden is met, the burden shifts to the nonmovant to prove that there is a genuine issue of fact that precludes summary judgment. *Id.* The nonmoving party must "go beyond the pleadings" and point to evidence of a real issue for trial. *Celotex*, 477 U.S. at 324 (quotation omitted). "A mere 'scintilla' of evidence" does not suffice; "there must be enough of a showing that the jury could reasonably find for [the nonmovant]." *Walker v. Darby*, 911 F.2d 1573, 1577 (11th Cir. 1990) (quotation omitted). In reviewing the

identified portions of the record, the Court draws all legitimate inferences in the nonmoving party's favor. *See Sconiers v. Lockhart*, 946 F.3d 1256, 1263 (11th Cir. 2020).

## III.   ANALYSIS

The FMLA provides "eligible employee[s]" twelve workweeks of leave during any twelve-month period to accommodate a "serious health condition that makes the employee unable to perform the functions" of their position. 29 U.S.C. § 2612(a)(1). DeSoto brings FMLA retaliation and interference claims against GEICO. Both fail. As a result, his Florida whistleblower claim necessarily fails too.

### A. FMLA Retaliation

To prove FMLA retaliation, DeSoto must show that GEICO intentionally discriminated against him for exercising his FMLA rights. *See* 29 U.S.C. § 2615(a)(2). Unlike an interference claim, DeSoto "faces the increased burden of showing that [GEICO's] actions were motivated by an impermissible retaliatory or discriminatory animus." *Strickland v. Water Works & Sewer Bd. of City of Birmingham*, 239 F.3d 1199, 1206 (11th Cir. 2001) (quotation omitted). Because there is no direct evidence that GEICO acted with "retaliatory intent" against DeSoto, the Court employs the *McDonnell-Douglas* burden-shifting framework to analyze the circumstantial evidence. *Martin v. Brevard Cty. Pub. Sch.*, 543 F.3d 1261, 1268 (11th Cir. 2008) (per curiam).

As the name suggests, that framework shifts the evidentiary burden back-and-forth between the parties (Plaintiff-Defendant-Plaintiff). DeSoto bears the initial burden to establish a prima facie case that GEICO violated the law—here § 2615(a). *See Batson v. Salvation Army*, 897 F.3d 1320, 1329 (11th Cir. 2018). If DeSoto is successful, the burden shifts to GEICO to articulate (not prove) a legitimate reason for its adverse actions against DeSoto. (*Id.*) If GEICO can provide a neutral reason, the burden shifts back to DeSoto, who must prove GEICO's stated reasons are pretextual. *See Hurlbert v. St. Mary's Health Care Sys., Inc.*, 439 F.3d 1286, 1297 (11th Cir. 2006). At the summary judgment stage, this means DeSoto must point the Court to evidence that would allow a reasonable jury to conclude that GEICO's stated reasons for its actions were not its real reasons. *See Munoz v. Selig Enters.*, 981 F.3d 1265, 1277 (11th Cir. 2020).

## 1. DeSoto Makes a Prima Facie Case of FMLA Retaliation

DeSoto bears the initial burden to make a prima facie case of FMLA retaliation. To meet his burden, DeSoto needs to show that (1) he engaged in statutorily protected activity; (2) he suffered an adverse employment action; and (3) the adverse employment action was causally connected to the protected activity. *See Martin*, 543 F.3d at 1268.

It is undisputed that Desoto's FMLA leave qualifies as statutorily protected activity, (Doc. 38 at 12), and that his written warning and termination qualify as adverse employment actions, (Doc. 44 at 2); *see Burling N. & Santa Fe Ry. Co. v. White*, 548 U.S.

53, 57 (2006) (defining an adverse employment action as something that "could well dissuade a reasonable worker" from engaging in protected activity). To the extent his Complaint includes other potential adverse actions that could serve as a basis for an FMLA retaliation claim, he has abandoned those arguments by not raising them in his response. (Doc. 44 at 2–3); *see Resolution Tr. Corp. v. Dunmar Corp.*, 43 F.3d 587, 599 (11th Cir. 1995) ("[G]rounds alleged in the complaint but not relied upon in summary judgment are deemed abandoned."); *accord St. Johns Riverkeeper, Inc., v. U.S. Army Corps of Eng'rs*, 462 F. Supp. 3d 1256, 1279–80 n.10 (M.D. Fla. 2020) (Howard, J.).

The sole question then is whether DeSoto can point to a causal connection between the adverse actions (DeSoto's written warning and termination) and the protected activity (DeSoto's FMLA leave). Because DeSoto's warning and termination occurred in "close temporal proximity" to his FMLA leave, DeSoto successfully carries his initial burden.

"[C]lose temporal proximity" between the adverse action and the protected activity is generally sufficient—by itself—to create a genuine issue of material fact regarding causal connection. *See Martin*, 543 F.3d at 1268 (concluding the plaintiff "easily" demonstrated a prima facie causality between his termination and his FMLA leave by pointing to a close temporal proximity between them); *accord Hurlbert*, 439 F.3d at 1298 (explaining that, at the prima facie stage, "[c]lose temporal proximity between protected conduct and an adverse employment action is generally sufficient circumstantial evidence to create a

genuine issue of material fact of a causal connection" (quotation marks omitted)). In the context of establishing the causation prong of a prima facie case of FMLA retaliation, temporal proximity "should be measured from the last day of an employee's FMLA leave until the adverse employment action at issue occurs." *Jones v. Gulf Coast Health Care Del., LLC*, 854 F.3d 1261, 1272 (11th Cir. 2017).

Here, DeSoto took FMLA leave on August 14, 2020, and from August 25–28, 2020. (Doc. 39-16 at 2.) GEICO issued him the written warning on August 24, ten days after his second to last FMLA-leave period. (Doc. 39-21.) DeSoto's termination followed on October 7, a little more than a month after his final FMLA leave period. (Doc. 39-2 at 20); *see Jones*, 854 F.3d at 1272–74 (concluding one month between the end of FMLA leave and the adverse actions is sufficiently close to raise an inference of causation); *accord Higdon v. Jackson*, 393 F.3d 1211, 1220 (11th Cir. 2004); *cf. Drago v. Jenne*, 453 F.3d 1301, 1308 (11th Cir. 2006) (holding a three-month gap between the protected activity and an adverse employment action is insufficient to show causation); *Thomas v. Cooper Lighting, Inc.*, 506 F.3d 1361, 1364 (11th Cir. 2007) (concluding that "[a] three to four month disparity between the statutorily protected expression and the adverse employment action" is too remote to create an inference of causation). The brief periods between the end of DeSoto's FMLA leave and his written warning and termination are sufficient to show causation at the prima facie stage.

GEICO does not meaningful argue for the absence of a "close temporal proximity" between the protected activity and the adverse actions. Instead, GEICO argues that "close temporal proximity" alone is insufficient for a prima facie case of causality here because GEICO claims that it was already "contemplat[ing]" warning and terminating DeSoto before he took FMLA leave. *Drago*, 453 F.3d at 1308; *accord Clark Cty. Sch. Dist. v. Breeden*, 532 U.S. 268, 272 (2001) (noting that a company's decision to proceed "along [the] lines previously contemplated, though not yet definitely determined, is no evidence [whatsoever] of causality."). This argument fails at the prima facie stage given the timeline. Even assuming GEICO's preferred date for when it began "contemplating" warning DeSoto—July 9, 2020—is undisputed, DeSoto had already begun taking intermittent FMLA leave (the relevant protected activity) by that point, as GEICO's own statement of undisputed facts demonstrates. (Doc. 39 at 3 ("On March 9, 2020, DeSoto returned from FMLA leave.").) Just the same for DeSoto's termination (the other adverse action), which followed the warning. (*Cf.* Doc. 43-4 at 29.) Therefore, GEICO's claim that it began "contemplating" warning and terminating DeSoto before he engaged in protected activity fails to persuade. *Cf. Drago*, 453 F.3d at 1308 (concluding no jury question on causation where the company contemplated the adverse action "for performance-related reasons" five months before the employee took FMLA leave).

12

### 2. GEICO Articulates a Neutral Reason for the Adverse Employment Actions against DeSoto

Given that DeSoto has carried his initial burden to make out a prima facie case of FMLA retaliation, the burden shifts back to GEICO to articulate a neutral reason for warning and terminating DeSoto. *See Chapman v. AI Transp.*, 229 F.3d 1012, 1024 (11th Cir. 2000) (en banc) ("[T]he employer's burden is merely one of production; it need not persuade the court that it was actually motivated by the proffered reasons." (quotation omitted)). GEICO readily does so. GEICO's proffered neutral reason for the written warning is DeSoto's failure to properly investigate a claim against an insured and his approval of a $10,000 payment under the wrong policy on July 2, 2020. (Doc. 38 at 17.) And its proffered neutral reason for DeSoto's termination is the audit results demonstrating that DeSoto violated the terms of the written warning after GEICO issued the warning. (*Id.* at 20.) DeSoto does not dispute that GEICO carries its burden of production. (Doc. 42 at 9.)

### 3. DeSoto Fails to Show that GEICO's Neutral Reasons for the Warning and Termination Were Pretextual

Because GEICO successfully articulates a non-retaliatory reason for both DeSoto's written warning and his termination, the burden shifts back to DeSoto to demonstrate that GEICO's "proffered reason[s were] pretextual by presenting evidence sufficient to permit a reasonable factfinder to conclude that the reasons given by [GEICO] were not the real

reasons for the adverse employment decision." *Martin*, 543 F.3d at 1268 (quotation omitted).

A plaintiff cannot establish an employer's proffered reasons for terminating him were pretextual simply by "quarreling with the wisdom" of those reasons. *See Brooks v. Cty. Comm'n of Jefferson Cty., Ala.*, 446 F.3d 1160, 1163 (11th Cir. 2006) (quoting *Chapman*, 229 F.3d at 1030). But the plaintiff can establish pretext by demonstrating "such weaknesses, implausibilities, inconsistencies, incoherencies, or contradictions in the employer's proffered legitimate reasons for its action that a reasonable factfinder could find them unworthy of credence." *Combs v. Plantation Patterns*, 106 F.3d 1519, 1538 (11th Cir. 1997) (quotation omitted).

DeSoto fails to put forth sufficient evidence to create a genuine dispute of material fact as to whether GEICO's neutral reasons for issuing him a written warning and terminating him were pretextual.

Begin with DeSoto's written warning. DeSoto admits that he approved the extracontractual payment. (Doc. 39-2 at 13.) And he does not dispute that GEICO regularly issues similar warnings to TCR II Supervisors for similar errors leading to extracontractual exposure. (Doc. 39-7 at 19.) DeSoto disagrees with Johnson's decision to issue the warning because he does not believe that he failed to properly investigate the claim. (Doc. 39-2 at 14.) But DeSoto's disagreement with Johnson's determination that a

warning was warranted does not constitute evidence that GEICO's explanation for its behavior is not honest. *See Chapman*, 229 F.3d at 1030 (noting that an employee cannot "substitute his business judgment for that of the employer" to support an FMLA retaliation claim); *see also Lockett v. Choice Hotels Int'l, Inc.*, 315 F. App'x 862, 868–69 (11th Cir. 2009) (noting that pretext analysis focuses "on the employer's beliefs rather than the employee's own perceptions"). DeSoto fails to point the Court to implausibilities, inconsistencies, incoherencies, or contradictions tending to show that GEICO's stated explanation for the written warning is a pretext.

Next take DeSoto's termination. Following his warning, GEICO's compliance department conducted an audit into a sample of DeSoto's claims. Such an audit is standard when an employee's errors subject GEICO to extracontractual exposure. (Doc. 39-7 at 16–17.) From the audit, Johnson determined that DeSoto had failed to properly investigate and provide guidance to his adjusters regarding another claim after he received the warning. (*Id.* at 21; Doc. 39-23 at 3.) Accordingly, GEICO terminated DeSoto's employment on October 7, 2020. (Doc. 39-24 at 11.)

DeSoto points the Court to several pieces of evidence in an attempt to "demonstrate such weaknesses, implausibilities, inconsistencies, incoherencies, or contradictions" that a reasonable factfinder could conclude GEICO's proffered reason for his termination—his

violation of the terms of his warning—is a pretext. *See Rioux v. City of Atlanta, Ga.*, 520 F.3d 1269, 1275 (11th Cir. 2008) (quotation omitted). He fails to do so.

First, DeSoto points to a remark by Katelyn Postin, a GEICO Human Resources employee, who stated that "[DeSoto] files complaints if something doesn't go his way." (Doc. 39-26 at 19.) According to DeSoto, this comment suggests that GEICO employees viewed him "negatively" after he raised concerns about GEICO's alleged "failure to respect his FMLA rights." (Doc. 42 at 13–14.) Even accepting DeSoto's assumptions about the context and meaning of this comment, Johnson—the relevant decision maker here—was unaware of the comment. (Doc. 39-28 at 3.) And there is no evidence that Postin's comment impacted or influenced GEICO's decision to terminate DeSoto in any way. *See Steger v. Gen. Elec. Co.*, 318 F.3d 1066, 1079 (11th Cir. 2003) (noting that statements by nondecisionmakers or by those unrelated to the relevant decision-making process will not satisfy the employee's burden).

Second, DeSoto claims GEICO treated him differently than other TCR II Supervisors who violated a warning due to similar claims handling errors. Specifically, DeSoto points to Barry Stemle and Angelina Price, arguing that GEICO performed an audit before issuing them warnings, whereas it issued DeSoto a warning without an audit. (Doc. 42 at 10–12.) The question is whether DeSoto, Stemle, and Price were "similarly situated in all relevant respects" and, if so, whether GEICO treated Stemle and Price "more

16

favorably" than it treated DeSoto following "nearly identical" misconduct. *Jackson v. Agency for Persons with Disabilities Fla.*, 608 F. App'x 740, 742–43 (11th Cir. 2015). But Price's warning does not indicate any errors that led to extracontractual liability, meaning her misconduct is not "nearly identical" with DeSoto's. (Doc. 43-11 at 3–4.) And the record indicates that Stemle was subjected to a post-warning audit like DeSoto and later terminated, which makes it difficult to argue Stemle was treated more favorably than DeSoto. (Doc. 39-7 at 19; Doc. 39-19 at 2.) At bottom, DeSoto fails to show that either Price or Stemle were treated "more favorably" following "nearly identical" misconduct.

Third, DeSoto claims Johnson (DeSoto's manager) sent Hedge (the office's director) an email on September 23, 2020, with an attached Microsoft OneNote document titled "FMLA" that gave "detailed information about DeSoto's FMLA usage." (Doc. 42 at 7.) DeSoto claims this document is evidence that "the two decision makers most involved" in terminating him "exchanged information" about his FMLA usage and concerns shortly before his termination. (*Id.* at 2.) The 24-page document in question is actually titled "Adrian.one," not "FMLA" as DeSoto claims. (Doc. 44-2.) Hedge testified that Johnson sent the document to her ahead of DeSoto's termination because Johnson kept notes about her interactions with DeSoto in the document, including her coaching notes leading up to his termination. (Doc. 39-7 at 15–16; Doc. 44-2 at 15–25.) Nothing in the document,

including the details of DeSoto's warning and termination, contradict Hedge's testimony that DeSoto's FMLA usage was not considered in his termination. (Doc. 39-7 at 15–16.)

Fourth, DeSoto notes that his termination memorandum includes examples from the audit of mistakes he made before his warning to support his termination. (Doc. 39-23.) True enough. But Hedge testified that these "incidental findings" included in the termination memorandum were not considered in the termination decision. (Doc. 39-7 at 21.) Even assuming that the pre-warning errors included in DeSoto's termination memorandum are inconsistent with GEICO's stated reason for his termination (his post-warning errors), this inconsistency is not significant enough in itself such that "a reasonable factfinder could find [GEICO's neutral reason] unworthy of credence." *Combs*, 106 F.3d at 1538 (quotation omitted).

In the absence of "significantly probative evidence" that GEICO's proffered neutral reasons for warning and terminating DeSoto were a pretext, *Brooks*, 446 F.3d at 1163 (quotation omitted), summary judgment is granted to GEICO on Desoto's FMLA retaliation claim.

### B. FMLA Interference

The FMLA gives "teeth" to its provisions by prohibiting an employer "from interfering with an employee's rights under the [a]ct." *Todd v. Fayette Cnty. Sch. Dist.*, 998 F.3d 1203, 1220 (11th Cir. 2021). To establish a prima facie case for FMLA

interference, DeSoto must demonstrate that GEICO denied him a benefit to which he was entitled under the FMLA. *See* 29 U.S.C. § 2615(a)(1); *Martin*, 543 F.3d at 1266–67; *accord Strickland*, 239 F.3d at 1207. Unlike a retaliation claim, DeSoto need not show that GEICO "intended to deny the right; the employer's motives are irrelevant." *Strickland*, 239 F.3d at 1208.

DeSoto's FMLA interference claim fails at the starting blocks because DeSoto has not identified any FMLA benefit that GEICO denied him. DeSoto himself admits that GEICO granted him all his requested FMLA leave. (Doc. 39-2 at 37–38.) And DeSoto fails to point to any evidence to show that GEICO failed to restore him to the same position following his periods of FMLA leave. Where "no interference with FMLA rights occurred," summary judgment is appropriate. *See Drago*, 453 F.3d at 1307.

Even assuming DeSoto was denied the right to reinstatement when he was terminated, GEICO had every right to terminate him because it has shown that DeSoto "would have been dismissed regardless of any request for FMLA leave." *Krutzig v. Pulte Home Corp.*, 602 F.3d 1231, 1236 (11th Cir. 2010). An employer can deny reinstatement to an employee following FMLA leave if it can demonstrate that it would have discharged the employee even if he had not been on FMLA leave. *See Jarvela v. Crete Carrier Corp.*, 776 F.3d 822, 831 (11th Cir. 2015); *see also Martin*, 543 F.3d at 1269 (Kravitch, J., concurring) (emphasizing that the FMLA "provides no greater protection against

19

termination unrelated to FMLA leave than the employee would have had if he had not requested leave").

GEICO has demonstrated as much here by pointing first to DeSoto's mistake (approving a large payment on the wrong policy) that directly led to $10,000 of extracontractual liability for GEICO and resulted in Johnson issuing DeSoto a written warning. (Doc. 39-4 at 23–24.) In accordance with GEICO's standard practice, a compliance team audited DeSoto following his receipt of the warning and discovered that he violated the terms of the warning by improperly handling a separate claim after the warning had issued. (Doc. 39-7 at 16–17, 21.) The latter violation of the warning's terms led to GEICO terminating DeSoto. (*Id.* at 21; Doc. 39-23.)

To the extent DeSoto is arguing that the claims taken by his coworkers in March and April 2020, Johnson's failure to notify him of a CU Supervisor job posting while he was out on FMLA leave in July 2020, or Johnson's decision to transfer time-sensitive claim files from his adjuster to another team while he was out on FMLA leave in August 2020 constitute FMLA interference, each argument would fail because it is undisputed that none of these episodes constituted adverse employment actions. In other words, those three events—even if DeSoto did not like them—did not affect his position in terms of benefits, pay, or the terms and conditions of his employment.

For these reasons, GEICO is entitled to summary judgment on DeSoto's FMLA interference claim.

### C. Florida Law Claim

Under the Florida Private Whistleblower Act (FWA), an "employer may not take any retaliatory personnel action against an employee" because that employee objects or refuses to participate in "any activity, policy, or practice of the employer which is in violation of a law, rule, or regulation." § 448.102(3), Fla. Stat. Like FMLA retaliation claims, FWA whistleblower claims are analyzed under *McDonnell-Douglas* as well. *See Kirkland v. City of Tallahassee*, 856 F. App'x 219, 224 (11th Cir. 2021) (citing *Griffin v. Deloach*, 259 So. 3d 929, 931 (Fla. 5th DCA 2018)).

Because DeSoto's FWA claim is based on the same adverse employment actions that form the basis for his FMLA retaliation claim and is also analyzed using *McDonnell-Douglas*, his FWA claim fails because—as the Court concluded above—DeSoto cannot rebut GEICO's legitimate, neutral reasons for warning and terminating him.

## IV.   CONCLUSION

Accordingly, the following is **ORDERED**:

1.      Defendant's Motion for Summary Judgment (Doc. 38) is **GRANTED**.

2.    The Clerk is directed to **ENTER JUDGMENT** in favor of Defendant, to

**TERMINATE** any pending motions and deadlines, and to **CLOSE** this

case.

**ORDERED** in Tampa, Florida, on July 8, 2022.

Kathryn Kimball Mizelle
United States District Judge

22